**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
_____
                               :
JALEL SAKET,                   :     Civil Action No. 05-5910(FLW)
                               :
          Plaintiff,           :
                               :
     v.                        :         OPINION
                               :
AVAYA, INC. LONG TERM          :
DISABILTY PLAN FOR SALARIED    :
EMPLOYEES, et al.,             :
                               :
          Defendants.          :
_____:
```

**WOLFSON, United States District Judge**

This is the Court's determination of the respective Motions for Summary Judgment filed by Plaintiff Jalel Saket ("Saket") and Defendants, Avaya, Inc. Long-Term Disability Plan For Salaried Employees and Avaya, Inc. Short-Term Disability Plan For Salaried Employees (collectively, "Avaya"). In a single-count complaint, Saket alleges that Avaya wrongfully denied him disability benefits under Avaya's Short-Term and Long-Term Disability Plans in contravention of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). Avaya contends, inter alia, that Avaya's decisions were appropriate and not arbitrary and capricious.[1] For the reasons stated herein, Saket's motion is

---

[1] Avaya also contends that Saket should be barred by the doctrine of judicial estoppel from asserting his claims for short-term disability benefits, based upon inconsistent statements that he made in other state court proceedings. See e.g., n 2., supra at 14.

DENIED and Avaya's motion is GRANTED; Avaya's request for
attorneys' fees and cost is DENIED.

**BACKGROUND**

    A.   *Saket's Employment with Avaya and His Claim
of Short Term Disability*

The following facts are undisputed by the parties. Saket
commenced his employment with Avaya as an Executive Information
Technology ("IT") Support Manager in July 2000. Avaya's Statement
of Undisputed Facts ("Avaya's Statements") at ¶¶10-11. During the
course of his employment, Saket was responsible for managing and
supporting the IT connectivity of the Corporate C.E.O. and key
executives worldwide. As a full time employee, Saket participated
in both Avaya's Short Term Disability Plan ("STD Plan") and Long-
Term Disability Plan ("LTD Plan") (collectively, the "Plans") for
salaried employees. Id. at ¶11.

Avaya is the Plan Administrator for both the STD Plan and the
LTD Plan. Id. at ¶4. Benefits provided by the Plans, including the
cost of administration, are self funded and paid by Avaya. Id. at
¶9. At all relevant times, Gates McDonald, Inc. ("Gates") was the
Claims Administrator for the Plans. The Plans grant Gates the
initial authority to administer STD and LTD benefit claims.
However, Avaya retains full discretionary authority to make benefit
determinations. Id. at ¶5-7. Pursuant to this authority, the
Plans' documents designate Avaya, or the Avaya Benefit Claim and
Appeal Committee ("BCAC") as its delegate, as the final review

2

committee and final authority for overturning or affirming STD and LTD claim denials made by Gates. Id. at ¶7.  All decisions made by the BCAC are assisted by legal, medical, and plan experts.

On December 18, 2000, Saket was physically assaulted in Jersey City, New Jersey, while shopping for an automobile at the J & S Ford auto dealership. Id. at ¶12.  Saket alleges that he suffered physical and emotional injuries as a result of that experience. However, despite the alleged injuries, Plaintiff continued to work from the period of December 2000 to September 2003, without claiming disability relating to the injuries. Id. at ¶12; Saket's Counter-Statement of Undisputed Material Facts ("Saket's Statements") at ¶13.

On August 28, 2003, Avaya's Corporate Security Department interviewed Saket concerning his alleged unauthorized access of desktop computer files of a co-worker.  Avaya's Statements at ¶14. Immediately thereafter, Saket did not return to work and claimed, for the first time since the December 2000 assault, that he was unable to work because of back pain and an inability to concentrate caused by post-traumatic stress disorder and depression.  Id. at ¶15. Saket's Dep. at 56-58.  Therefore, Saket applied for benefits under the STD Plan.  Id. at ¶16.  At the time that Saket's benefit claim was under review, the STD Plan operated under a Summary Plan Description whereby a participant must be "totally disabled" in order to qualify for benefits under the STD Plan.  See STD Summary

Plan Description ("SPD").   A participant is considered totally
disabled if the Claims Administrator determines that the applicant
"cannot perform any of the substantial and material duties of the
job [he] had had before [his] disability, and are unable to be
accommodated at another job within the Company."  SPD at p.7.

After submitting his claim, Saket was informed by Gates'
representative, Lizett Zayas, that in order to process and approve
his request, his treating physicians must complete and return the
Healthcare  Providers'/Physician's  Reports  ("HPR").  Avaya's
Statements at ¶17.  Thereafter, Saket provided Gates with the names
and phone numbers of his health care providers.  The HPRs were then
faxed to each of the physicians. Id.

With respect to Saket's emotional injuries, on or around
September 18, 2003, Gates first received a completed HPR from
Saket's Psychologist, Dr. Ronald Weinberg, providing a diagnosis of
post-traumatic stress disorder with major depression.  Dr. Weinberg
indicated that Saket's condition was "guarded" and noted that Saket
was also being seen by a psychiatrist.  In his report, Dr. Weinberg
did not provide a return to work date. See Weinberg's HPR.

With respect to Saket's back pain, on September 22, 2003,
Gates received a completed HPR from Saket's orthopedic surgeon, Dr.
Arash Emami, stating a diagnosis of degenerative disc disease.
According to Dr. Emami, Saket's inability to work due to this
disease started on September 5, 2003, and Dr. Emami indicated a

4

return to work date of October 5, 2003 with restrictions of sitting up to 2 hours, standing/walking up to 3 hours, limited twisting/bending/stooping, no climbing and that Saket could lift up to 10 pounds 35% of the time. Additionally, Dr. Emami indicated that Saket's condition was to be further diagnosed by a pain management physician, Dr. Hang Pak. See Dr. Emami's HPR.

Between September 22, 2003 and October 29, 2003, Gates attempted to gather additional medical information in connection with Saket's STD benefit claims. Specifically, Gates spoke with Saket's psychiatrist, Dr. Pasquale Romeo, and requested in writing that he provide certain medical information to assist in evaluating Saket's STD claim since Dr. Romeo had failed to return the initial HPR form that was faxed to him. At that time, Gates did not receive any information from Dr. Romeo. Avaya's Statements at ¶20; Saket's Statement at ¶20.

Gates also spoke and wrote to with Dr. Emami requesting him to provide certain medical documentation. During their telephone conversation, Dr. Emami advised that Saket was on longer under his care. Dr. Emami further advised that Saket was under the care of Dr. Pak. Avaya's Statements at ¶ 21. Gates also attempted to gather information from Dr. Weinberg, but to no avail. Id. at ¶22. Gates spoke with Saket directly on multiple occasions, seeking information from him. During one of the conversations, Saket stated that the primary medical issue was his back, but was

reluctant to discuss his mental health issues, citing confidentiality concerns even after being assured that the information was confidential and would be not shared with non-medical persons. Id. at ¶23.

Despite the efforts by Gates, on or around October 29, 2003, Saket left a voice message with Gates stating that he was released by Dr. Romeo to return to work. Subsequently, Saket returned to work on November 3, 2003. Once Saket returned to work, he informed his supervisor, Kimberly Gerardi, that he was able to work and had a return to work release from Dr. Romeo, which apparently was never received by Avaya. During the same conversation, Ms. Gerardi informed Saket that the corporate security investigation had substantiated inappropriate computer access on his part. Ms. Gerardi also informed Saket that he was being placed on paid leave and he would have the opportunity to respond before Avaya decided on a course of action with respect to his employment. Id. at ¶¶24-27; Saket's Statements at ¶¶24-27.

Thereafter, Saket, again, claimed to be disabled after stating that he was able to work. Avaya's Statement at ¶30. By this time, Saket had hired an attorney, Stafford Thompson, Esq., who confirmed that Dr. Romeo had previously cleared Saket to return to work as of November 3, 2003. However, Mr. Thompson wrote a letter to Dr. Romeo suggesting the possibility of Saket again being classified as totally disabled under the STD Plan. Id. at ¶29; Saket's

6

Statements at ¶29.  Faced with Saket's new claim of disability, between November 3, 2003 and November 25, 2003, Gates attempted to gather necessary medical information in order to assess Saket's application for short-term disability benefits.

Avaya received a completed HPR form dated October 27, 2003 - before Saket returned to work on November 3, 2003 - from Dr. Weinberg indicating a diagnosis of post-traumatic stress disorder and depression.  However, a return to work date was not addressed in the form.  <u>See</u> Dr. Weinberg's October 27, 2003 HPR. Gates further contacted Dr. Romeo but failed to obtain any information from him at that point in time.  Avaya's Statements at ¶31.  Gates did receive a note dated November 11, 2003, from Saket's neurologist, Dr. William Wasserstrom, simply stating, without any documentation, that Saket was under his care and unable to work until further notice.  <u>See</u> Dr. Wasserstrom' Note dated November 11, 2003.  Gates' efforts to collect the proper medical documentation from Dr. Wasserstrom were resisted.  Gates also received a medical report dated September 12, 2003 - before Saket returned to work on November 3, 2003 - from Dr. Pak stating a diagnosis of herniated discs and a recommendation of lumbar fusion to be conducted. However, the information supplied did not indicate whether Saket was disabled as defined by the Plans.  <u>See</u> Dr. Pak's Report dated September 12, 2003.

Gates repeatedly encountered difficulty gathering needed medical information from Saket's health care providers to verify his disability, especially from Dr. Romeo and Dr. Wasserstrom. Thus, Gates sent Saket a letter dated November 11, 2003, advising that the information received to date did not support Saket's absences and that his STD claims might be denied if adequate information were not received by November 25, 2003. See Gates' Letter dated November 11, 2003. Saket failed to provide additional information. Thus, on November 25, 2003, Gates informed Saket that his application for STD benefits was denied effective as of October 7, 2003, but Saket would receive STD benefits from the STD Plan from the time period September 12, 2003 through October 6, 2003 ("Gates' Decision"). Avaya's statements at ¶38.

B.   *The First Appeal*

On December 4, 2003, Saket sent a letter to Avaya which stated that he was unaware of Gates having issues regarding receipt of documentation from his health care providers, and Saket further notified Avaya that he had been recently admitted to a hospital, for a new aliment, due to chest pain. Thereafter, Saket made a formal appeal by letter dated December 23, 2003. See Saket's December 23, 2003 Letter.

In considering Saket's appeal, Avaya reviewed the documentation previously submitted to Gates as well as the additional information belatedly supplied by Saket - after the

8

November 25, 2003 denial - and by his treating physicians, including HPR forms from Dr. Romeo and Dr. Wasserstrom. Dr. Romeo's HPR, dated December 17, 2003, stated that Saket suffered major depressive disorder and post traumatic stress disorder. The HPR noted a previous return to work date of November 1, 2003, but recommended a return to work date of "undetermined." See Dr. Romeo's December 17, 2003 HPR. Dr. Wasserstrom's HPR indicated a diagnosis of lumbar disc herniation with restriction of no climbing and no lifting over 20 pounds. However, the HPR failed to indicate whether Saket was disabled. See Dr. Wasserstrm's December 16, 2003.

Based on all information, Avaya affirmed Gates' Decision that Saket be paid STD benefits from September 12, 2003 to October 6, 2003 and be denied STD benefits from October 7, 2003 through November 23, 2003 and December 16, 2003 through January 9, 2004. Avaya did, however, determine there was sufficient documentation to support Saket's new chest pain/cardiac problems from November 24, 2003 through December 15, 2003. Avaya based its determinations on the lack of medical records to support a claim of total disability since key portions of the previously requested documentation (i.e. progressive notes) were never received despite repeated requests. The decision was memorialized in a letter dated January 9, 2004, to Saket ("Avaya's Decision"). Avaya's Statement at ¶44.

C.   *The Termination of Saket's Employment and the Second Appeal*

Saket's employment with Avaya was terminated on January 19, 2004, based upon a finding of misconduct in connection with the inappropriate computer access incident.  <u>Id.</u> at ¶46.  Later in 2004, Saket initiated another appeal of Avaya's Decision.  In support of his appeal, Saket, represented by counsel, submitted correspondence dated April 14, 2004, May 5, 2004 and May 6, 2004, as well as several attachments, including an April 15, 2004 Medical and Functional Capacity Assessment prepared by Dr. Weinberg and an April 2, 2004 Vocational Evaluation prepared by The Miller Group.  The appeal was referred to BCAC for its review.  <u>Id.</u> at ¶48; Saket's Statements at ¶48.  On June 11, 2004, BCAC formally declined to overturn Gates' Decision and Avaya's Decision.  In a detailed explanation, the reasons for the denial were provided:

<u>Dr. Romeo</u>

Saket initially refused to sign the release information for Dr. Romeo.  Medical progress notes could not be obtained without this signature.

Dr. Romeo's notes were later included with the appeal indicating that Saket was seen from July 24, 2003 through December 29, 2003, but there were no notes past December.  The notes also indicated that the employee was stabilized during his October 29, 2003 visit, which is the date Saket left Avaya a voice mail message stating that he was released to return to work.

Saket apparently received a release to return to work from Dr. Romeo and, in fact, returned to work on November 3, 2003.  This release was never obtained, despite repeated requests directed to the physician and Saket.

The one out of work note submitted by Dr. Romeo was not dated.

10

Dr. Emami

Dr. Emami released Saket to return to work on or around October 5, 2003.  Dr. Emami then referred Saket to Dr. Pak, who did not address Saket's ability to work, then referred the patient back to Dr. Emami.

Dr. Wasserstrom

Dr. Wasserstrom's one page November 11, 2003 out of work note does not include any objective findings or medical documentation to support the disability.

An additional HPR form received from Dr. Wasserstrom in December 2003 was received after the November 25, 2003 denial letter was sent and did not include progress notes to support a finding of total disability.

Dr. Weinberg

Saket failed to follow the recommended 2 times per week psychotherapy treatment with Dr. Weinberg.

The assessment completed by Dr. Weinberg in April 2004 states a diagnosis of post-traumatic stress disorder and depression, but was prepared many months after the November 2003 denial, contained no progress notes to support the severity of the condition, was based on Saket's current condition and not his condition in 2003, and was prepared by his treating physician rather than an independent examiner.

The 2000 Assault

Saket was able to work and function at his job for a period of years after the 2000 assault at J&S Ford. Medical information that was received indicated that while Saket sought treatment for his back condition since the assault occurred, he did not miss any significant time from work until September 2003.

Overall

The denial was based on Saket's condition at the time of his absence in the fall of 2003 and the lack of medical information received to support his ongoing disability.

11

See Avaya's Medical Case Manager Case Summary at pp. 4-5.  BCAC further stated that "[g]iven the diagnosis of [post traumatic stress disorder], which is valid, in which Mr. Saket [is] treating thru medication and psychotherapy, the fact that he has been functional throughout the course of the last three years, [BCAC] found little evidence for a total disability."  BCAC's Letter Dated June 24, 2004 at p. 1.

Essentially, BCAC's decision was based on the fact that the medical information received by Avaya at all relevant times was insufficient to show that Saket was "totally disabled" under the STD Plan's definition.

D.   *The Third Appeal*

On June 14, 2004, BCAC received a letter from Saket's counsel, Mr. Elkind, advising that Saket had been approved for Social Security Administration ("SSA") disability benefits.  Mr. Elkind also enclosed a psychiatric evaluation from Saket's treating psychiatrist, Dr. Romeo, indicating a diagnosis of post-traumatic stress disorder.  Avaya's Statement at ¶51.  Subsequently, BCAC decided to consider the additional documentation submitted by Saket and reopened the case.  By letter dated July 22, 2004, BCAC requested from Mr. Elkind all documents relating to Saket's application for SSA disability benefits.  On July 28, 2004, Mr. Elkind only sent the SSA Notice of Award, which BCAC already possessed.  Id. at ¶¶52-53.

12

On August 3, 2004, BCAC sent another letter to Mr. Elkind asking if there was any other correspondence among him, Saket and the SSA.  Mr. Elkind responded that he had already supplied to BCAC what he had previously supplied to the SSA.  As a result, no additional information was provided.  Id. at ¶54. Due to the lack of information, BCAC affirmed its decision to deny Saket's claim for STD benefits for the identical reasons as previously found. Id. at ¶55.

    E.   *Saket's Attempt of a Fourth Appeal*

On December 1, 2004, the State of New Jersey, Department of Labor ("NJDOL") awarded Saket temporary disability benefits, pursuant to New Jersey's Temporary Disability Benefits Law, for the time period September 5, 2003 through September 11, 2003; October 8, 2003 through November 23, 2003; and December 17, 2003 through February 29, 2004 ("NJDOL Order").  Avaya was directed to pay Saket state benefits from its private short-term disability plan.  See the NJDOL Order.  On September 9, 2005, Saket, relying primarily on the SSA and NJDOL rulings, appealed the prior decisions by BCAC denying him STD benefits.  Avaya's Statement at ¶59.  Avaya responded to the appeal in an October 6, 2005 letter, advising that BCAC would not consider the appeal because the appeal was not timely; the SSA and NJDOL decisions did not overturn or reverse BCAC's denial of Saket's appeal under the STD Plan; and BCAC had

13

already considered Saket's appeal on two separate occasions.  See Avaya's Letter dated October 6, 2005.

Subsequently, on December 16, 2005, Saket initiated the instant suit alleging that Avaya wrongfully denied him STD and LTD benefits in violation of ERISA. In his one-count Complaint, Saket requests, pursuant to 29 U.S.C. § 1132(a) of ERISA, that the Court overturn Avaya's decision denying him STD and LTD benefits from March 1, 2004 through the date a judgement is entered.  Complaint at p.9.[2]  Both parties filed motions for summary judgment, claiming that the Court may decide this case as a matter of law as no genuine issue of material fact exists.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

---

[2]Saket apparently initiated two separate state court actions in Superior Court of New Jersey, Union County.  In the first lawsuit, Jalel Saket v. J&S Ford, Inc., et al., UNN-L-5469-02 (Saket ultimately received a $750,000 settlement), Saket allegedly testified that he was physically unable to return to work in January 2004.  However, in the pending wrongful termination action, Jale Saket v. Avaya, Inc. and Kimberly Gerardi, UNN-L-4388-05, Saket allegedly claimed that he was ready and able to return to work at Avaya in January 2004 and requested the state court to reinstate his employment.

14

fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.  The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330.  To show that a genuine issue of material fact exists, the nonmoving party may not rest upon mere allegations, but must present actual evidence in support thereof. Anderson, supra, 477 U.S. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290 (1968)).  In evaluating the evidence, the Court must "'view the inferences to be drawn from the underlying facts in the light most favorable to the [nonmoving] paty.'" Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002)(quoting Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999)).

## II.  Avaya's STD Plan and LTD Plan

An ERISA plan administrator must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions [ERISA] . . . ." 29 U.S.C. § 1104(a)(1)(D).  Avaya's STD Plan provides that in order to qualify for STD benefits, a participant must be "totally disabled. SPD at p.10.  "Totally disabled," a defined term under the STD Plan, means that a claimant "cannot perform any of the substantial and material duties of the job [he or she] had before [the]

15

disability, and are unable to be accommodated at another job within the Company." Id. at p.7.

In order to prove total disability, a claimant must "provide information from [his or her] recognized health care provider, satisfactory to the Claims Administrator, certifying [his or her] disability, including the nature and frequency of [the] treatment." Id. at p.10. Furthermore, a claimant must "follow the recommended treatment." Id. at p.10. In order to be eligible for the LTD benefits, a claimant must be disabled after receiving the full 26 weeks of STD benefits. Id. at p.9. Furthermore, under both Plans, the claimant must be an eligible employee, which is defined as "a regular, active, full-time or part-time salaried or term employee who works for [Avaya]." Id. at p.8.

As such, according to the Summary Plan Description, Saket bears the burden of presenting the required medical information to Avaya in order for Avaya to determine that Saket is totally disabled and Saket must be an employee at the time when he made his claims. See Abanthya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 46-47 (3d Cir. 1993) ("burden of proving entitlement to coverage . . . benefit rests with the claimant").

**III.     Saket is Not Entitled to STD Benefits From March 1, 2004 to March 12, 2004 and LTD Benefits.**

Avaya approved Saket's STD benefits for the periods of September 12, 2003 through October 6, 2003 and November 24, 2003 through December 15, 2003 but denied benefits from October 7, 2003

through November 23,2003 and December 16, 2003 through January 9, 2004.  However, Saket relies on NJDOL's December 1, 2004 ruling and contends that because NJDOL ordered Avaya to pay for the entire period of September 5, 2003 through February 29, 2004, NJDOL's decision should be substituted for Avaya's decisions regarding his STD benefits.  As such, Saket is requesting the Court overturn Avaya's decision to deny him STD benefits from March 1, 2004 to March 12, 2004 and LTD benefits.[3]  The Court finds Saket's contention without merit and his claim fails as a matter of law.

Under New Jersey's Temporary Disability Benefits Law ("TDBL"), N.J.S.A. 43:21-25, et seq., "[a]ny covered employer may establish a private plan for the payment of disability of benefits in lieu of the benefits of the State Plan . . . ."  N.J.S.A. 43:21-32.  If a private plan is established, "[a] covered individual shall not be entitled to any benefits from the State disability benefits fund with respect to any period of disability commencing while he is covered under an approved private plan."  N.J.S.A. 43:21-33.  To be considered disabled, the TDBL mandates that the claimant "suffers any accident or sickness not arising out of and in the course of the individual's employment . . . resulting in the

_____

[3]Saket incorrectly calculated the 26-week period of his STD benefits. According to the STD Plan, once Saket was eligible for STD benefits, his coverage began on the eighth consecutive day of absence for a certified disability. SPD at p.5.  Thus, as Saket's disability was certified from September 5, 2003, his coverage began on September 12, 2003.  In order for Saket to receive his benefits under the LTD Plan, he must first exhaust all 26 weeks of benefits under the STD Plan, which is the period of September 12, 2003 to March 12, 2004.

17

individual's total inability to perform the duties of employment."
<u>N.J.S.A.</u> 43:21-29.

In accordance with the rules and procedures set forth by the
TDBL, NJDOL found Saket to be disabled and ordered Avaya to pay,

> [Saket's] *Temporary Disability Benefits* under the
> employer's Private Plan No. SX-52046 from September 5,
> 2003 through September 11, 2003, October 8, 2003 through
> November 23, 2003 and December 16, 2003 through February
> 29, 2004 subject to his receipt of Worker's Compensation
> benefits and exhaustion of the claim.

NJDOL Order at p.3 (emphasis added).   In that Order, NJDOL
specifically required Avaya to pay Saket temporary disability
benefits under its private plan, not STD benefits under its "health
and welfare plan"; the private plan and the STD plan are distinct
plans.

Avaya's STD Plan, Plan No. 518, is considered a "health &
welfare plan" established pursuant to ERISA.  SPD at p.22.  As
discussed above, pursuant to ERISA, Avaya established the
procedures which a claimant must take in order to receive STD
benefits.  These procedures are at variance with the procedures and
decision-making provisions of the TDBL.  <u>See</u> <u>N.J.S.A.</u> 43:21-25 to
-56.  If the Court were to accept Saket's contention, ERISA based
disability plans in New Jersey would no longer follow the mandate
of ERISA, and its guidelines, established by the plan
administrator, would effectively be replaced by the TDBL.  Clearly,
NJDOL did not intend to replace ERISA when it issued its ruling.

18

Moreover, NJDOL certainly cannot act as the final decision-maker of an ERISA plan because in doing so, NJDOL would take on the role of this Court, which is contrary to established case law. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)(a denial of benefits challenged under § 1132(a)(1)(B) of ERISA is to be reviewed by the District Court); see also Abnathya, 2 F.3d at 44. Thus, NJDOL's ruling, with respect to Saket's temporary disability benefits under state law, cannot substitute for Avaya's decisions regarding Saket's STD benefits under the STD Plan.[4]

Having determined that the benefits arising from the TDBL are separate and distinct from those arising from Avaya's STD Plan, Saket simply cannot claim that he has exhausted all 26 weeks of STD benefits because he only received forty-five days of STD benefits (i.e. September 12, 2003 through October 6, 2003 and November 24, 2003 through December 15, 2003). In addition, Saket never initiated new claims after Avaya's January 9, 2004 decision denying him STD benefits for the periods of October 7, 2003 through November 23, 2003 and December 16, 2003 through January 9, 2004. The appeal process that ensued was only to review that particular decision. Therefore, the Court will not go beyond the administrative record and grant Saket STD benefits, nunc pro tunc,

---

[4]Saket argues that because Avaya paid disability benefits from its private short-term disability plan, Saket has exhausted his STD benefits, at least until February 29, 2004. The Court disagrees. Avaya, pursuant to the NJDOL Order, paid Saket certain benefits only to satisfy its obligations under state law.

after January 9, 2004.  More importantly, Saket's employment was terminated with cause on January 19, 2003; his STD and LTD benefits ended after that date as he no longer was an active employee. Accordingly, the undisputed facts of this case overwhelmingly demonstrate that Saket is not entitled to  STD benefits from March 1, 2004 to March 12, 2004, and Saket did not fulfill the 26-week requirement in order to be eligible for his LTD benefits.

IV.  **Avaya's Decisions Denying Saket's STD Benefits Were Not Arbitrary and Capricious**

A.  *Applicable Standard of Review Under ERISA*

Even if the Court were to review Avaya's decisions to deny Saket STD and LTD benefits on the merits, Saket's claim fails as a matter of law.  In order to examine Avaya's decisions, the Court's first task is to determine the applicable standard of review under ERISA in this particular case.

The Supreme Court, in <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), held that a denial of benefits under ERISA is to be reviewed "under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Id.</u> at 115.  Thus, where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "'will not be disturbed if reasonable.'" <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 437 (3d Cir. 1997) (quoting <u>Firestone</u>, 489 U.S. at 111).  In other words, when a plan administrator has

20

discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard. <u>See</u> <u>Stoetzner v. United States Steel Corp.</u>, 897 F.2d 115, 119 (3d Cir. 1990) (application of deferential arbitrary standard of review is appropriate when benefit plan gives administrator discretionary authority to determine eligibility); <u>see also</u> <u>Miller v. Metropolitan Life Ins. Co.</u>, 925 F.2d 979, 983 (6th Cir. 1991) (held the same).

Under the arbitrary and capricious standard of review, the district court may overturn a decision of the plan administrator only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" <u>Abnathya v. Hoffman-La Roche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993) (quoting <u>Adamo v. Anchor Hocking Corp.</u>, 720 F.Supp. 491, 5000 (W.D. Pa. 1989); <u>see</u> <u>also</u> <u>Miller</u>, 925 F.2d at 984 (ERISA plan administrator's decisions on eligibility are not arbitrary and capricious if "rational in light of plan's provisions") (citation omitted). "This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the [plan administrator] in determining eligibility for plan benefits.'" <u>Abnathya</u>, 2 F.3d at 45 (citation omitted).

However, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining

whether there is an abuse of discretion." <u>Firestone</u>, 489 U.S. at 115; <u>see</u> <u>Kosiba v. Merck & Co.</u>, 384 F.3d 58, 64 (3d Cir. 2004) ("[I]n reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations").  Thus, this conflict of interest warrants a modified or "heightened" form of the arbitrary and capricious standard of review. <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 378 (3d Cir. 2000).  This heightened standard of review is to be formulated on a sliding scale basis, "which enables [a court] to review[] the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of beneficiaries." <u>Id.</u> at 391 (quoting <u>Doe v. Group Hospitalization & Med. Servs.</u>, 3 F.3d 80, 87 (4th Cir. 1993)).

In employing the sliding scale approach, courts take into account the following factors in deciding the severity of the conflict: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact 'the presumed desire to maintain employee satisfaction.'" <u>Stratton v. E.I. DuPont de</u>

Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004) (quoting Pinto, 214 F.3d at 392).  In light of the foregoing, for the reasons that follow, the Court will apply a slightly heightened arbitrary and capricious standard of review.

Avaya is the Plan Administrator for both the STD Plan and the LTD Plan.  Avaya's plan documents provide that the Plan Administrator retains full discretionary authority despite the initial grant of authority to Gates to administer plan benefits. Pursuant to this authority, the Plan Administrator has delegated BCAC as the final review committee and the final authority for overturning or affirming the claim denials made by Gates.  BCAC also has sole and complete discretionary authority for the determination of all questions relating to the eligibility for participation and disability benefits.  Although Gates makes the initial decisions for claim benefits, BCAC is involved as a second level internal appeals process for claim denials.  Avaya as the Plan Administrator, or BCAC as its delegate, retains final authority regarding benefit claims.  Therefore, the Court will apply the arbitrary and capricious standard of review to Avaya's denials of Saket's STD and LTD benefits, and analyze where on the sliding scale the heightened standard should fall.[5]

---

[5] In Saket's submissions to the Court, he does not contest this standard of review, which Avaya applied as well.  In fact, Saket employed the arbitrary and capricious standard in his Brief in Opposition to Defendants' Motion for Summary Judgment.

Consistent with the Third Circuit's approach in <u>Pinto</u>, the Court finds that the factors weigh in favor of a slightly heightened arbitrary and capricious standard.  The second and fourth factors do not justify heightening the standard.  Regarding information accessibility, Saket does not contend that he was denied access to pertinent information during his application and appeals process for STD and LTD benefits. In fact, based on the record before the Court, information was equally accessible to all parties.  As for the fourth factor, there is no evidence showing that Saket's disability claim will have a detrimental effect on Avaya's financial status if Avaya were to grant his claims. Neither did Saket offer any evidence regarding the financial health of Avaya that would undermine the presumed desire to maintain employee satisfaction.  In addition, it is inconceivable that Saket's claim would negatively impact Avaya.

On the other hand, the first and third factors justify a slightly heightened arbitrary and capricious standard of review. With respect to the first factor, the record shows that although Saket was represented by counsel during the entire appeals process, Saket was not represented during the initial stage of his claim process with Gates.  Thus, Avaya was more sophisticated than Saket during the initial claim application phase.  Furthermore, the third factor also warrants slightly heightening the standard as the financial arrangement between Gates and Avaya would presumably

24

present a conflict because Gates was paid on a per claim basis by Avaya.  As guided by <u>Pinto</u>, the Court has to "accommodate what appears to be a potential, even if negligible chance of conflict." <u>Pinto</u>, 363 F.3d at 255.  Accordingly, based on the Court's finding pertaining to the first and third of the <u>Pinto</u> factors, the Court will employ a slightly heightened arbitrary and capricious standard of review.[6]  The Court, next, turns to the administrative record to determine whether Avaya's decisions were arbitrary and capricious based on Saket's submission of medical information.

B.  *Administrative Record*

A trial court has to be mindful that under the arbitrary and capricious standard of review, "the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed." <u>Mitchell</u>, 113 F.3d at 440.  As such, a court is not permitted to examine materials beyond the administrative record in order to determine if the claim denial was arbitrary and capricious. <u>Kosiba v. Merick</u>, 384 F.3d 58, 67 n. 5 (3d. Cir. 2004).  Furthermore, in considering the record, courts are not permitted to look beyond evidence required by the plan documents. <u>Mitchell</u>, 113 F.3d at 443.  Here, the parties dispute the scope of the administrative record before Avaya when it made its decisions and the bases for its decisions.

---

[6]Indeed, the Court, in <u>Morely v. Avaya, Inc.</u>, No. 04-0409, 2006 U.S. Dist. LEXIS 53720, at *39-40 (D.N.J. Aug. 3, 2006), held that due to the nature of Avaya's LTD Plan, a slightly heightened arbitrary and capricious standard of review is warranted.

The parties dispute whether five specific reasons, which formed the basis of Avaya's denials, are supported by the administrative record.  These issues include:

1. The timing of Saket's disability request was suspicious ("timing issue").

2. Saket initially refused to discuss mental health issues and provide available documentation ("cooperation issue").

3. Saket's attempt to return to work in November 2003 ("return-to-work issue").

4. Saket presented a sudden new disability when faced with potential discipline ("sudden new disability issue").

5. Saket's available medical documentation did not substantiate his request for disability benefits ("substantiation issue").

Saket admits that the administrative record properly reflects the cooperation issue; return-to-work issue; and substantiation issue. However, Saket contends that the administrative record did not include the timing issue, which was the alleged suspiciousness of the timing when Saket made his request for disability (i.e. right after Saket was interviewed for his alleged misconduct) and Saket's new aliment when he was faced with potential discipline from Avaya, or the sudden new disability issue.  Avaya, on the other hand, contends that all five issues were contained in the record when it made its decisions.

While the Court finds that the issues were contained in the administrative record, the relevant inquiry is whether Avaya relied on those issues when making its decisions.  See Skretvedt v. E.I.

<u>Dupont de Nemours and Co</u>., 268 F.3d 167, 177 (3d. Cir. 2001) (post
hoc reasons for denial is inappropriate for the court to consider).
Indeed, the decision rendered by Gates on November 25, 2003, stated
that Saket failed to provide medical documentation supporting his
absence and this was the sole reason given by Gates when it denied
Saket's STD benefits.  (Gates' Denial Letter dated November 25,
2003, p. 1.)  Similarly, in Avaya's letter dated January 9, 2004,
denying Saket's first appeal, Avaya plainly stated that Saket's
appeal is denied due to the fact that "[d]ocumentation received did
not support [his] total disability [and] portions of the requested
documentation (progress notes) were not received."  Avaya's Denial
Letter dated January 9, 2004 at p. 1.  Moreover, BCAC stated in its
denial of Saket's second appeal that "the decision of the denial
was based on the condition of Mr. Saket at the time of his absences
and the lack of medical documentation received to support the
ongoing disability."[7]  BCAC's Denial Letter dated June 24, 2004 at
p.1.  Necessarily, however, the lack of medical substantiation
subsumed the cooperation issue since neither Saket nor his medical
provider properly responded to requests for medical documentation.

---

[7]As for BCAC's resolution dated August 13, 2004, BCAC simply denied
Saket's appeal based on Saket's failure to produce the necessary documentation
relating to his SSA award for his proclaimed disability.  Furthermore, BCAC's
October 6, 2005 denial letter to Saket stated that the SSA and NJDOL decisions
did not overturn or reverse BCAC's previous denials of Saket's appeals.

Accordingly, since the Court is not permitted to review post-hoc reasons for denial, and since the timing, sudden new disability, and return to work did not form the bases for Avaya's decisions to deny Saket's STD benefits, the Court will only review the substantiation issue because it specifically relates to Avaya's reasoning for denying Saket STD and LTD benefits (i.e. the medical reports).  See Matuszak v. Torrington Co., 927 F.2d 320 (7th Cir. 1991) (post-hoc reasons for denial not entitled to deference by reviewing court); see also Shelden v. Barre Belt Granite, 25 F.3d 74 (2d. Cir. 1994) (district court cannot affirm a denial of benefits by ascribing to the plan a reason for denial other than the one proffered by the claimant).[8]

C.    *Avaya's Decisions of Saket's STD Benefits*

To reiterate, Avaya, in its January 9, 2004 decision, granted Saket STD benefits for the periods of September 12, 2003 through October 6, 2003 and November 24, 2003 through December 15, 2003; but denied STD benefits from October 7, 2003 through November 23,2003 and December 16, 2003 through January 9, 2004.  This decision spawned Saket's appeals.  Thus, the relevant disability period is from September 5, 2003 to January 9, 2004.  Saket relies on several medical reports from his physicians to establish his total disability status during that period.  It is undisputed that

---

[8]Even if the Court were to consider the other issues, it finds the substantiation issue alone is sufficient for the Court to determine that Avaya was not arbitrary and capricious in making its decisions.

during the course of the appeal process, Avaya considered these reports when making its decisions. As such, the Court will examine each report.

Dr. Weinberg

The HPR, submitted by Dr. Weinberg on September 18, 2003, only indicated a diagnosis of post-traumatic stress disorder and depression and noted that Saket's condition is guarded. The HPR contains little information regarding Saket's medical condition and it does not indicate a return to work date. Importantly, the HPR failed to indicate whether Saket was totally disabled. See Dr. Weinberg's September 18, 2003 HPR. Although Dr. Weinberg's September 29, 2003 letter furnished more information with respect to Saket's post-traumatic stress disorder, he failed to indicate a return to work date. Rather, Dr. Weinberg stated a vague period of a return to work date of 1-3 months, which was indicative that Saket was able to work in the near future. See Weinberg's September 29, 2003 Letter at ¶2. Furthermore, the letter expressly stated that Saket resisted his treatment by failing to see Dr. Weinberg at prescribed times, a requirement under the STD Plan. Dr. Weinberg further advised that additional treatment must be performed by Saket's psychiatrist, Dr. Romeo, and deferred to Dr. Romeo to determine a return to work date. Id. at ¶1-3. This further indicated that Dr. Weingberg's report was lacking.

29

Dr. Weinberg, after being contacted by Avaya, submitted another HPR on October 27, 2003.  Similarly, this HPR failed to indicate a return to work date and provided little information about Saket's condition.  Notably, this report came right before Dr. Romeo, Saket's psychiatrist, released Saket back to work on November 3, 2003.  This is of importance because Dr. Weinberg expressly deferred to the opinion of Dr. Romeo in his correspondence to Avaya.  Id. at ¶3.

The last medical report produced by Dr. Weinberg is a Medical and Functional Capacity Assessment ("FCA") dated April 15, 2004. Based on the doctor's own notations, the report only reflected Saket's condition in April 2004, not his condition at the relevant period of September 2003 through January 2004.  FCA at p.6.  Such report is unreliable, thus, afforded less weight, because the report indicated a disability well after the relevant coverage period at issue.  See Dunbar v. Orbital Sciences Corp. Group Disability Plan, 265 F.Supp. 2d 572 (D. Md. 2003) ("Medical reports prepared substantially after the relevant date of disability are of little relevance in determining whether a claimant is disabled). Based on the Court's review of Dr. Weinberg's submissions, Avaya did not act arbitrarily and capriciously, even under a slightly

heightened standard, when it refused to rely on solely Dr. Weinberg's diagnoses and his submissions.[9]

    Dr. Romeo

      Dr. Romeo released Saket back to work on November 3, 2003. Before the  release, Dr. Romeo failed to submit a HPR or any pertinent information regarding Saket's condition even after repeated demands were made by Avaya.  On December 17, 2003, Dr. Romeo finally submitted a HPR in which he diagnosed Saket with major depressive disorder and post-traumatic stress disorder.  See Dr. Romeo's December 17, 2003 HPR at p.1.  The note accompanying the HPR indicated Saket's PTSD and that Saket was "totally disabled" from work without providing supporting documentation or a return to work date.  Id. at p.3.  The Court finds that such conclusory statement was insufficient for Avaya to find that Saket was in fact totally disabled.  See Abnathya, 2 F.3d at 47-48 (The Third Circuit held that conclusory note from treating physicians stating only an opinion that a claimant is totally disabled is insufficient for a claimant to substantiate his disabled status).

    Saket's counsel provided another evaluation by Dr. Romeo to BCAC in connection with the Third Appeal.  This time, the Psychiatric Evaluation ("PE") failed to indicate a date on which

_____

[9]Saket argues that Avaya must have, during the appeal process, informed Saket of the specific reasons why it refused to rely on the medical reports submitted by various physicians in order to be able to use such reasoning during litigation. However, as discussed at length in this Opinion, Avaya repeatedly stated in its decisions, when denying Saket's STD Benefits, the reasons why Saket's medical documentation was insufficient.

Saket became disabled.   See PE.   Although Dr. Romeo stated that
Saket should not be permitted back to work due to his condition,
Dr. Romeo's report did not mention why he released Saket back to
work in November 2003. See PE at p.1.   The Court finds that such
inconsistency lacks the medical certainty that Avaya needed to
substantiate Saket's mental condition.   Thus, Avaya did not act
arbitrarily and capriciously, under a slightly heightened standard,
when it refused to rely on Dr. Romeo's medical documentation.

Mr. Martinez and The Miller Report

Mr. Martinez's Functional Capacity Report ("FCR")presented
similar problems.  The report was prepared on March 11, 2004, well
after the onset of Saket's disability in September 2003.   FCR at
p.3.   Avaya was reasonable in concluding that the FCR failed to
properly reflect Saket's condition back in September 2003 and
January 2003 because Saket's Orthopedist, Dr. Emami, previously
released Saket to return to work on October 5, 2003.   With these
conflicting reports, Avaya did not act arbitrarily and
capriciously, even under a slightly heightened standard, when it
refused to rely on Mr. Martinez's FCR.

In addition, the Court finds that because the Miller Group's
Report, dated April 2, 2004, was a collection of medical
documentation from various physicians, it does not satisfy the
requirement under the STD Plan. According to the STD Plan, Saket
must "provide information from [his] recognized health care

32

provider." SPD at p.10. The Miller Group's Report was not an independent physician's determination of Saket's condition. Therefore, Avaya acted reasonably in refusing to rely on the Miller Group's Report. Additionally, the Report was created months after the relevant disability period.

After carefully reviewing the administrative record before the Court, Saket simply failed to present the required medical documentation under the STD Plan to prove his total disability status with respect to the periods of October 7, 2003 through November 23, 2003 and December 16, 2003 through January 9, 2004. While the Court is cognizant that Saket was able to obtain disability benefits through the SSA and NJDOL, the Court cannot substitute its own determination of whether Saket was totally disabled under the STD Plan. Simply put, the medical documentation contained within the administrative record is insufficient for this Court to determine that Avaya acted arbitrarily and capriciously, under a slightly heightened standard, in denying Saket's STD and LTD benefits.[10]

---

[10] On May 30, 2007, the Court received additional submissions from Avaya in connection with its argument that Saket is barred by the doctrine of judicial estoppel from asserting inconsistent statements that he made in other court proceedings relating to his claims for STD benefits. However, as the Court has decided the parties' motions based on other grounds, the Court does not reach this issue here.

**V.   Avaya Failed To Prove That It Is Entitled To An Award Of Attorneys' Fees and Costs**

Pursuant to ERISA, "the court in its discretion may allow a reasonable attorney's fees and costs of action to either party." 29 U.S.C. § 1132(g)(1).   The Third Circuit has delineated five factors in determining whether to award fees in this context: (1) the offending party's culpability or bad faith; (2) the ability of the offending party to satisfy an award of attorney's fees; (3) the deterrent effect of an award; (4) the benefit conferred upon members of the pension [or welfare] plan as a whole; and (5) the relative merits of the parties' position.   <u>Ursic v. Bethlehem Mines</u>, 719 F.2d 670, 673 (3d. Cir. 1983).

The Court holds that the factors weigh against awarding Avaya attorneys' fees and costs.   With respect to the first factor, the Court does not find that the filing of the instant suit amounts to bad faith by Saket.   His legal and factual arguments are not wholly without merit, especially, since the SSA and NJDOL had already awarded him disability benefits.   Based on the record, Saket is likely incapable of paying an award of attorney's fees as Saket is a single parent without employment.   Furthermore, having determined that Saket's suit is not without merit, this matter would have no deterrent effect on subsequent claims and would provide no benefit to other participants in Avaya's disability plans.   Finally, in regards to the relative merits of the parties' position, the Court has already determined that Saket's position has some, albeit

34

limited, merit.  Accordingly, the <u>Ursic</u> factors weigh in favor of denying Avaya's request for attorneys' fees and costs.

## III. CONCLUSION

For the reasons discussed herein, Avayas' motion for summary judgment is GRANTED but Avayas' request for attorneys' fees and costs is DENIED.  Saket's motion for summary judgment is DENIED. An appropriate order will follow to reflect this Opinion.


Dated: June 25, 2007                         /s/ Freda L. Wolfson
                                     Freda L. Wolfson, U.S.D.J.

35